**Terrance V. BEAUCHAMP, Plaintiff,**

v.

**FLEX–N–GATE LLC, Defendant.**

**No. 04–70911.**

United States District Court,
E.D. Michigan,
Southern Division.

Feb. 23, 2005.

William A. Roy, Esq., Bloomfield Hills, MI, for plaintiff.

A. Read Cone, III, Esq., Dean & Fulkerson, Troy, MI, for defendant.

## OPINION AND ORDER REGARDING CROSS–MOTIONS FOR SUMMARY JUDGMENT

ROSEN, District Judge.

### I. INTRODUCTION

Plaintiff Terrance V. Beauchamp commenced this action in Wayne County Circuit Court, State of Michigan, on February

19, 2004, asserting a state-law claim of race discrimination and a federal claim for overtime pay against his former employer, Defendant Flex–N–Gate LLC. Defendant removed the case to this Court on March 11, 2004, citing Plaintiff's assertion of a claim arising under the federal Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*

By motions filed on October 25, 2004, both Plaintiff and Defendant seek summary judgment in their favor on Plaintiff's claim for overtime pay under the FLSA.[1] The issue presented in these cross-motions is straightforward—namely, whether Plaintiff was exempt from the FLSA's overtime pay requirement by virtue of the duties he performed as a production supervisor at Defendant's Hoover Road facility in Detroit, Michigan. Specifically, Defendant argues that Plaintiff was employed in an "executive ... capacity," 29 U.S.C. § 213(a)(1), and thus was not entitled to time-and-a-half overtime pay under the FLSA, while Plaintiff maintains that his duties did not fit the "executive" or any other statutory exemption from the federal requirement of overtime compensation.

The Court heard oral argument on the parties' cross-motions on February 17, 2005. Having reviewed the briefs and supporting materials submitted by the parties, and having considered the arguments of counsel at the February 17 hearing, the Court is now prepared to rule on these motions. This Opinion and Order sets forth the Court's rulings.

## II. *FACTUAL BACKGROUND*

For present purposes, it is enough only to describe the overall nature of the operations performed at Defendant's Hoover Road facility in Detroit and the duties generally performed by a production su-

pervisor at this facility. The Court discusses Plaintiff's specific job duties in further detail below, as they bear upon the question whether Plaintiff was exempt from the overtime pay requirement of the FLSA.

Defendant Flex–N–Gate LLC assembles and ships parts to various automobile manufacturers, including DaimlerChrysler and Nissan. Its Hoover Road facility, also known as the "SPD" facility, carries out "sequencing" operations, serving as a just-in-time supplier for automotive assembly plants. The SPD facility periodically receives "broadcasts" via a computer link from the assembly plants, through which Defendant is notified about the parts needed at the plant in the next few hours. Defendant uses these broadcasts to retrieve the requested parts from storage, perform any necessary additions or assembly, place the parts on racks in the required sequence, and ship the properly sequenced parts to the appropriate assembly plant.

In order to carry out this sequencing operation, Defendant's SPD facility is organized into three areas or departments. First, the individuals who work in the broadcast area are responsible for receiving broadcasts from assembly plants and translating the coded broadcast information into "pick" sheets used to determine the parts to be retrieved and the sequence in which to ship them. Next, the shipping and receiving department is responsible for receiving inbound shipments of parts and supplies and shipping the sequenced parts to the requesting assembly plant. Finally, the production department carries out the retrieval and sequencing of parts, plus additional assembly when necessary, as specified in the pick sheets derived from

1. Defendant also sought summary judgment in its favor on Plaintiff's state-law claim of race discrimination. By stipulated order en-

tered December 9, 2004, however, this claim was dismissed with prejudice, leaving only Plaintiff's FLSA claim still to be resolved.

the broadcast information. The production staff, in turn, are organized into work cells, typically consisting of two to five employees, with each cell responsible for a specific part (such as, for example, a rear bumper, front bumper, or grille).

After initially working at Defendant's SPD facility as an employee of a temporary help agency, Plaintiff was hired by Defendant in March of 1997 as a member of the plant's hourly workforce. Following a series of transfers and promotions, Plaintiff became a production supervisor in June of 2001. Plaintiff's claim for overtime pay in this case is limited solely to this production supervisor position, which he continued to occupy until Defendant terminated his employment on February 28, 2003. Consequently, the question presented here is whether the duties of a production supervisor fit within an exemption from the FLSA requirement of time-and-a-half overtime compensation.

### III. ANALYSIS

#### A. The Standards Governing the Parties' Cross–Motions

Through their present cross-motions, each party seeks summary judgment in its favor pursuant to Fed.R.Civ.P. 56 on Plaintiff's FLSA claim for overtime pay. Under this Rule, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Here, the parties seemingly agree on the operative facts concerning the job duties of a production supervisor, but they disagree as to the legal significance of these duties under the FLSA. Accordingly, the Court turns to this controlling issue of law.

#### B. Plaintiff's Employment as a Production Supervisor Was Encompassed Within the FLSA's "Executive" Exemption.

As noted, Plaintiff's claim for overtime compensation in this case is limited to the period during which he worked as a production supervisor at Defendant's SPD facility. (See Plaintiff's Motion, Br. in Support at 1 ("[A]t all relevant times ..., [Plaintiff] was a production supervisor at the Flex–N–Gate facility located on Hoover Rd. [i]n Detroit.").) Thus, the resolution of the parties' cross-motions turns upon the question whether the duties of a production supervisor fit within one of the statutory exemptions from the FLSA requirement of time-and-a-half overtime pay. Upon considering this issue in light of the controlling statutory provisions and federal regulations, the Court finds that Plaintiff is not entitled to an award of overtime compensation.

#### 1. The Standards Governing Plaintiff's Claim for Overtime Pay under the FLSA

Plaintiff's claim for overtime pay in this case rests upon the general command of the FLSA that, "[e]xcept as otherwise provided," an employer cannot insist that an employee exceed a 40–hour workweek unless the employee receives overtime pay "at a rate not less than one and one-half times the regular rate." 29 U.S.C. § 207(a)(1). Under certain specified circumstances, however, an employer need not compensate its employees at this statutory overtime rate. Of particular relevance here, the FLSA specifically exempts from its coverage "any employee employed in a bona fide executive, administrative, or professional capacity ... (as such terms are defined and delimited from time to time by regulations of the Secretary [of Labor] )." 29 U.S.C. § 213(a)(1).

"The exemptions to the FLSA's overtime provisions are to be narrowly construed against the employers seeking to assert [them], and the employer bears not only the burden of proof, but also the burden on each element of the claimed exemption." *Martin v. Indiana Michigan Power Co.,* 381 F.3d 574, 578 (6th Cir.2004) (internal quotation marks and citations omitted). Consequently, because of this shifting of the burden of proof, Plaintiff "is entitled to summary judgment unless the defendant can come forward with evidence at least creating a genuine issue of material fact as to whether [Plaintiff] meets each and every element of the exemption." *Martin,* 381 F.3d at 578. "If [Defendant] fails to proffer such evidence, not only must its motion for summary judgment be denied, but summary judgment for [Plaintiff] must be granted." 381 F.3d at 578.

In this case, Defendant appeals to the "executive" exemption as set forth in the statute and its implementing regulations.[2] Under the pertinent regulations, this exemption applies to any employee who is paid a salary "of not less than $455 per week," and:

(2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;

(3) Who customarily and regularly directs the work of two or more other employees; and

(4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100(a).[3] "Management," in turn, is defined as:

includ[ing], but ... not limited to, activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked, or sold; controlling

---

**2.** Although Plaintiff addresses both the "executive" and the "administrative" exemptions in his motion, Defendant has not advanced any sort of argument that the latter exemption should apply here.

**3.** Prior to their amendment in 2004, the governing regulations established a "long test" and a "short test" for determining whether an employee fits within the "executive" exemption. *See Ale v. Tennessee Valley Authority,* 269 F.3d 680, 683–84 (6th Cir.2001) (describing this prior regulatory framework). The parties refer exclusively to these earlier regulations in their briefs, with both sides agreeing that the "short test" would apply here because Plaintiff earned more than the threshold amount of $250 per week. The Court need not decide whether the current or prior version of the regulations should control here, because the application of the "executive" exemption in this case turns upon essentially the same factors, and the current test for "executive" status is at least as protective of employees as the earlier "short" test. *See* 69 Fed.Reg. 22122, 22131 (Apr. 23, 2004) (stating that the amended regulations adopt "the current short test requirements plus a third objective requirement taken from the long test"). Thus, if Defendant can satisfy the new standard for application of the "executive" exemption, it follows that the company also could satisfy the prior "short" test.

the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102.

The record indicates that Plaintiff earned a salary of at least $37,000 as a production supervisor, and the parties otherwise agree that the salary-related portions of the test for "executive" status are satisfied here. Accordingly, this leaves only the question whether the duties performed by Plaintiff as a production supervisor establish the remaining, duty-based elements of the "executive" exemption. The Court now turns to this inquiry.

**2. The Duties Performed by Plaintiff as a Production Supervisor Triggered the FLSA's "Executive" Exemption.**

 At first glance, it might appear that a production supervisor at Defendant's SPD facility clearly should be deemed an "executive" under the FLSA and its implementing regulations, as this individual presumably would be responsible for managing "a customarily recognized department or subdivision" of Defendant's operations at this facility, 29 C.F.R. § 541.100(a)(2)— namely, the production department. Yet, the regulations caution against an inordinate focus on an individual's job title, stating that this "alone is insufficient to establish the exempt status of an employee." 29 C.F.R. § 541.2. In addition, the regulations require that the employee's "primary duty" be management, 29 C.F.R. § 541.100(a)(2), explaining that:

4. Plaintiff first became a production supervisor in June of 2001, a few months before Defendant adopted this job description, but he agreed at his deposition that this document

a relief supervisor or working supervisor whose primary duty is performing nonexempt work on the production line in a manufacturing plant does not become exempt merely because the nonexempt production line employee occasionally has some responsibility for directing the work of other nonexempt production line employees when, for example, the exempt supervisor is unavailable.

29 C.F.R. § 541.106(c). Thus, the Court must examine more closely the duties actually performed by Plaintiff in his position as a production supervisor.

The evidence on this point consists of (i) documents setting forth the job duties of a production supervisor and (ii) the deposition testimony of Plaintiff and his superiors as to what tasks he was expected to perform in this position. As to the former, the record includes two documents that, in Plaintiff's view, encompassed most or all of his duties and responsibilities as a production supervisor. (*See* Defendant's Response to Plaintiff's Motion, Ex. D, Plaintiff's Dep. at 40–41.) The first of these documents, prepared by former human resources manager Karen Andriths and dated October 23, 2001,[4] is a formal job description for the position of "Production and Assembly Supervisor," and states in pertinent part:

**SUMMARY**

Supervises and coordinates activities of workers engaged in assembling parts or assemblies into units by performing the following duties.

**ESSENTIAL DUTIES AND RESPONSIBILITIES include the following. Other duties may be assigned.**

lists most of the duties that he performed as a production supervisor. (*See* Plaintiff's Dep. at 40–41.)

Studies production schedules and estimates worker hour requirements for completion of job assignments.

Interprets company policies to workers and enforces safety regulations.

Communicates specifications, blueprints, and job orders to workers, and assigns duties.

Examines items assembled to determine if items meet specifications.

Establishes or adjusts work procedures to meet production schedules.

Recommends measures to improve production methods, equipment performance, and quality of product.

Suggests changes in working conditions and use of equipment to increase efficiency of shop, department, or work crew.

Analyzes and resolves work problems, or assists workers in solving work problems.

Initiates or suggests plans to motivate workers to achieve work goals.

Maintains time and production records.

Estimates, requisitions, and inspects materials.

Confers with other supervisors to coordinate activities of individual departments.

Reports machine and equipment malfunctions to maintenance personnel.

Ability to perform activities of workers supervised.

(Defendant's Response to Plaintiff's Motion, Ex. C, 10/23/2001 Job Description.)

This job description further states that the production and assembly supervisor reports to the plant manager,[5] and that the "FLSA Status" of this position is "Exempt." [6]

In addition to this formal job description, Defendant has produced an undated document entitled "Shift Supervisor's Daily Responsibilities," and Plaintiff agreed at his deposition that he performed "most of" the duties enumerated in this document. (*See* Plaintiff's Dep. at 41.) These duties included, among others, the responsibility to "[m]aintain the proper manning levels and set quota[ ]s for each work cell," to "[h]old employees accountable for work performance ˙ and enforce the company work rules," to "[a]udit the work instructions in the work cells and look for ways to improve productivity," to "adhere to the safety requirements and enforce them on the plant floor to all hourly and management employees," and to "[h]andle all employee issues," including "vacations, [timekeeping] adjustments and discipline." (*See* Defendant's Response to Plaintiff's Motion, Ex. C, Shift Supervisor's Daily Responsibilities.)

These written materials, on their face, encompass most of the duties cited in the regulations as typical of an "executive" position. Among the items in common between the regulatory examples of "management" duties, *see* 29 C.F.R. § 541.102, and the job description for a production supervisor are: (i) the assignment of

5. During the period that Plaintiff was a production supervisor, the plant manager at Defendant's SPD facility was Gerald R. Guriel. Guriel testified at his deposition that this job description accurately depicted Plaintiff's duties as a production supervisor, with the sole exception that Plaintiff "[n]ever had anything to do with blueprints." (Guriel Dep. at 26.)

6. As noted by Plaintiff, there is evidence in the record that, under prior plant management, at least some supervisors were paid overtime. (*See, e.g.,* Andriths Dep. at 9.) In addition, Plaintiff has produced timesheets from the period when he was a plant manager that reflect his status as "non exempt." (*See* Plaintiff's Motion, Ex. 18.) Neither party, however, argues that Defendant's designation of a position as "exempt" or "non-exempt," or its past practice of paying overtime to its supervisors, should be accorded any particular weight or significance in the Court's present inquiry.

duties to employees; (ii) the estimation of manpower and adoption and adjustment of work procedures in order to meet production needs; (iii) the maintenance of time and production records; (iv) the handling and resolution of work problems and employee complaints; (v) the recommendation of changes in work procedures and production methods; (vi) the estimation and requisition of materials; (vii) the enforcement of company policies and safety regulations; and (viii) the disciplining of employees. In short, upon comparing the regulatory definition of "management" duties and Defendant's description of the essential duties and responsibilities of a production supervisor, the Court finds that they are largely coextensive, and that the points of deviation are relatively minor.

Moreover, the deposition testimony of Plaintiff and other management officials at Defendant's SPD facility bridges much of this modest gap. With regard to the hiring of employees, for example, Defendant's human resources manager, Karen Andriths, testified that the company initially filled its worker needs through a temporary agency, but that the elevation of such workers to permanent status—or, alternatively, the determination that a temporary worker should no longer be sent to work at Defendant's facility—was based upon the recommendation of the temporary employee's supervisor. (See Andriths Dep. at 10–12.) This comports with the regulatory requirement that an executive's suggestions and recommendations as to hiring "are given particular weight." 29 C.F.R. § 541.100(a)(4); see also 29 C.F.R. § 541.105 (defining "particular weight" as

depending upon, among other factors, "the frequency with which the employee's suggestions and recommendations are relied upon"). Similarly, as to discipline and firing, both Andriths and Defendant's plant manager, Gerald Guriel, testified that the supervisors typically initiated the progressive disciplinary process set forth in the collective bargaining agreement that would lead to an hourly worker's discharge. (See Andriths Dep. at 12; see also Guriel Dep. at 32.)

Plaintiff also testified about a number of functions that he performed that are cited in the FLSA regulations as "management" duties. He testified, for example, that he trained employees in the production department as to the proper use of tools and other equipment in performing their designated tasks. (See Plaintiff's Dep. at 38–39.) He also authorized requests for vacations and determined who should work overtime, making sure as to this latter determination that he was adhering to the terms of the collective bargaining agreement in assigning overtime according to worker seniority. (See id. at 25, 39.)[7] Plaintiff further testified that he conducted yearly reviews of the production department's hourly employees, that he disciplined these employees, and that he generally was responsible for ensuring that these workers adhered to the company's procedures and instructions. (See id. at 37–38.) Finally, Plaintiff acknowledged that he regularly supervised perhaps as many as twenty employees, (see id. at 43–44),[8] thereby satisfying the "two or more" numerical requirement under the pertinent regulation, § 541.100(a)(3). This testimo-

---

7. Indeed, Plaintiff testified that, if he erred in assigning overtime, this would result in a union grievance that, if successful, would require Defendant to compensate all higher-seniority employees who should have had priority in the assignment of overtime. (See id. at 25.)

8. Plaintiff apparently worked exclusively on the second shift as a production supervisor. During this shift, he was the only production supervisor at the facility, and the only other supervisor who typically was at the plant during this shift was the supervisor for the shipping and receiving department.

ny, along with the written materials describing the duties of a production supervisor, amply meets the regulatory criteria for "executive" status.

Against all this evidence of a production supervisor's management duties, Plaintiff observes that Defendant's SPD facility was a "closely controlled environment" in certain respects, (*see* Plaintiff's Motion, Br. in Support at 11), thereby limiting the discretion exercised by supervisors in carrying out their oversight functions. Plaintiff notes, for example, that Defendant's overall operations at the plant were constrained by the "QS9000" automotive industry standards and guidelines that Defendant adopted for this facility, which dictated to a significant extent the precise procedures that workers would follow in carrying out the sequencing process. Plaintiff further observes that a supervisor's hiring authority was limited by the company's use of a temporary worker agency as the initial source of new employees, and that his disciplinary powers were limited by the terms of the collective bargaining agreement.

Yet, nothing in the governing regulations or relevant case law requires that a supervisor must have unfettered discretion in the performance of his management duties in order to be deemed an "executive." In elaborating upon the requirement that an executive's hiring and firing recommendations be given "particular weight," for example, the FLSA regulations explain that "[a]n employee's suggestions and recommendations may still be deemed to have 'particular weight' even if a higher level manager's recommendation has more importance and even if the employee does not have the authority to make the ultimate decision." 29 C.F.R. § 541.105. In addition, Defendant points to the First Circuit's holding that supervisors in the fast food industry—an industry where worker tasks "are spelled out in

great detail," and where individual supervisors generally lack the authority to alter these corporate policies—qualify as "executives" under the FLSA and its regulations. *Donovan v. Burger King Corp.*, 672 F.2d 221, 226 (1st Cir.1982). In so ruling, the Court observed that "[e]nsuring that company policies are carried out constitutes the very essence of supervisory work." *Donovan*, 672 F.2d at 226 (internal quotation marks and citation omitted).

Similarly, in this case, Defendant's production supervisors carry out management functions by training workers to perform their tasks in accordance with the QS9000 standard and other corporate policies and practices, and by ensuring that the employees in their charge actually meet these standards in their daily work. As defense counsel noted at oral argument, it is not enough merely to propagate standards—rather, supervision is necessary so long as a company must rely on human workers to carry out these standards. Indeed, this point is confirmed in the "wheel flare sequencing" instructions Plaintiff has provided to the Court—this document emphasizes to workers that "[i]n all situations, if you have trouble understanding your job duties or need any type of assistance, see your supervisor." (Plaintiff's Motion, Ex. 16, Wheel Flare Sequencing Instructions at 4.) This document further states that supervisors have the responsibility to "[r]ead, understand, and enforce these requirements," and to train new workers in accordance with the instructions. (*Id.* at 5.)

At the February 17 hearing, however, Plaintiff's counsel suggested that certain Sixth Circuit precedents demand that employees possess a higher degree of discretion in order to be deemed "executives" under the FLSA. Plaintiff points first to the decision in *Schaefer v. Indiana Michigan Power Co.*, 358 F.3d 394 (6th Cir.

2004), in which the Court reversed a district court ruling that the plaintiff "environmental specialist" was exempt from the FLSA's overtime pay requirement. In so ruling, the Court observed that the nuclear power industry is heavily regulated, and that "[t]he very purpose of such detailed regulations and procedures is to create conformity which has the practical effect of minimizing discretion." *Schaefer*, 358 F.3d at 404. Applying this reasoning here, Plaintiff contends that the workforce at Defendant's SPD facility exercises only minimal discretion in light of the highly detailed QS9000 standard that governs the sequencing process.

Yet, as noted by Defendant, *Schaefer* differs from the present case in one crucial respect. The question before the Court in *Schaefer* was whether the plaintiff's position was "properly classified as exempt under the *administrative* exemption of the FLSA." 358 F.3d at 398 (emphasis added). As such, the Court addressed the regulations governing this administrative exemption, including the requirement that "the employees's primary duty 'includes work requiring exercise of discretion and independent judgment.'" 358 F.3d at 400 (quoting 29 C.F.R. §§ 541.2, 541.214). Here, in contrast, the availability of the executive exemption turns upon the performance of "management" duties, 29 C.F.R. § 541.100(a)(2), and there is no analogous requirement that these duties entail the exercise of discretion or independent judgment. Rather, the focus is on activities typically associated with management or supervision, such as hiring and firing, apportioning and directing the work of subordinates, evaluating performance, and handling employee complaints and discipline. *See* 29 C.F.R. 541.102 (defining "management" duties). Hence, *Schaefer's* observations about a possible correlation between a highly regulated work environment and a lesser degree of employee discretion have little bearing upon Plain-

tiff's classification as an "executive" in this case, and do little to distinguish the First Circuit's reasoning in *Donovan*.

Nonetheless, Plaintiff correctly points out that the Sixth Circuit expressly distinguished *Donovan* in *Ale*, *supra*, 269 F.3d at 691. In particular, the Court rejected the employer's reading of *Donovan* as standing for the proposition that supervisors who are "in charge of their shifts" automatically qualify as "executives" under the FLSA regulations. Rather, the Sixth Circuit cautioned that "[t]he words 'in charge' are not a magical incantation that render an employee a *bona fide* executive regardless of his actual duties." *Ale*, 269 F.3d at 691. Upon reviewing the actual duties of the plaintiff shift supervisors in *Ale*, the Court affirmed the lower court's ruling that these employees were not exempt, on the grounds: (i) that the employees were not engaged in supervision as their primary task, but instead spent more of their time performing clerical duties, and (ii) that even their supervisory tasks were "not managerial in nature because [the plaintiffs] had no control over the people they supervised" and lacked the authority to "set or adjust the hours of work, determine which employees manned which posts, or train employees." *Ale*, 269 F.3d at 692.

Upon reviewing this case law, it is evident to the Court that the facts here are more analogous to those presented in *Donovan* than in *Ale*. First, the record here indicates that Plaintiff, like the supervisors in *Donovan* but unlike those in *Ale*, spent the bulk of his time performing managerial tasks, and only a modest amount of time covering the duties normally performed by the hourly workforce. Next, and more importantly, while the shift supervisors in *Ale* were largely "supervisors" in name only, and lacked most of the authority typically associated with management, the

production supervisor position at Defendant's facility is charged with most of the responsibilities and duties that are deemed "management" functions under the controlling regulations.

Even Plaintiff largely concedes this latter point. Instead, he contends only that a production supervisor's discretionary powers and flexibility in performing these management duties are limited by such factors as the QS9000 quality assurance standard in use at the SPD facility, the method for hiring new employees, and the terms of the collective bargaining agreement that governs Defendant's hourly workforce. As discussed earlier, however, these limits to a production supervisor's authority do not alter the essential "managerial" nature of the duties actually performed by Plaintiff in this position. Accordingly, the Court finds as a matter of law that Plaintiff was employed in a "bona fide executive" capacity during the period that he held a production supervisor position at Defendant's SPD facility.

### IV. CONCLUSION

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendant's October 25, 2004 Motion for Summary Judgment is GRANTED, and that Plaintiff's October 25, 2004 Motion for Partial Summary Judgment is DENIED.